UNITED STATES DISTRICT COURT
FOR THE SOUTHERN OF NEW YORK
-----------------------------------------------------------x
EVERETT W. COX III and NAN PING
PENG, the natural parents of Nan Ping
RAPHAEL COX, on behalf of their minor
son and on their own behalf,

      Plaintiffs,

vs.

WARWICK VALLEY CENTRAL
SCHOOL DISTRICT, FRANK
GREENHALL, SUPERINTENDENT
OF SCHOOLS, DEBRA GIRARDI,
SCHOOL PSYCHOLOGIST and
JOHN J. KOLESAR, JR., PRINCIPAL,
WARWICK MIDDLE SCHOOL,

      Defendants.
-----------------------------------------------------------x

**COMPLAINT**



'07 CIV 10682
BRIEANT

By their attorney, Michael H. Sussman, plaintiffs allege against defendants as follows:

I. **PARTIES**

1. Plaintiffs Everett W. Cox III and Nan Ping Peng are the natural parents of the minor, Peng Raphael Cox [hereinafter "Raphael"], who is 14 years of age.

2. Plaintiff Nan Ping Peng [hereinafter "Nan Ping"] is of Chinese descent and resides in Warwick, in Orange County. Plaintiff Cox [hereinafter "Cox"] resides in Cornwall, New York. Plaintiffs enjoy joint custody of Raphael.

3. At all relevant times, plaintiffs have resided within this judicial district.

4. Defendant Warwick Valley Central School District is a municipal corporation organized pursuant to the laws of the State of New York.

5. Defendant WVCSD may sue and be sued.

6. Defendant Frank Greenhall [hereinafter "Greenhall"] is the Superintendent of Schools for the WVCSD. He is sued in his official and individual capacities for violations of the civil and constitutional rights of the plaintiffs and their minor child.

7. Defendant Debra Girardi [hereinafter "Girardi"] is a school psychologist employed at all relevant times by the WVCSD. She is subject to suit in her personal capacity for the violation of the civil and constitutional rights of the plaintiffs and their minor child.

8. Defendant John J. Kolesar, Jr. [hereinafter "Kolesar"] is the principal of the only middle school operated by the WVCSD and is sued in his personal capacity for the violation of the civil and constitutional rights of the plaintiffs and their minor child.

## II. JURISDICTION

9. As plaintiffs allege that defendants violated rights afforded them by the First and Fourteenth Amendments to the United States Constitution, the Court has jurisdiction pursuant to 28 U.S.C. secs. 1331, 1343 (3) & (4) and 42 U.S.C. secs. 1983 and 1988.

## III. FACTUAL ALLEGATIONS

10. During the 2006-07 school year, Raphael was an eighth grade student at the middle school.

11. Previously, Raphael had attended 6th and 7th grades at the middle school and, with one exception, passed his courses and had served an in-school suspension for defending himself after being pushed by another young man [7th grade].

12. Around Columbus Day of 2006, Raphael was attacked by another student, prompting Nan Ping to come to the middle school to speak with the Assistant Principal [Jackson] and express concern for her son's safety and warn that if the school could not control the other student, Raphael might retaliate.

13. Thenceforward and with no particularized basis and with the approval and at the direction of defendant Kolesar, school officials repeatedly searched plaintiff's locker.

14. In January 2007, toward the end of the second marking period, Raphael's English teacher asked him to write a composition about a "perfect day".

15. Raphael wrote that his perfect day would feature a treasure hunt in an armed helicopter. In his fictional account, his friends and an ice cream truck were on the helicopter with him, looking for gold. In describing the helicopter, Raphael stated that the helicopter could destroy a town or drop gum on it. In the narrative story, the ice cream truck showers ice cream on the town.

16. In response to this narrative, on or about February 8, 2007, defendants Kolesar and Girardi, the guidance counselor and two teachers met with plaintiffs. On this occasion, Girardi provided her alarmist interpretation of Raphael's fiction and insisted there was no other way to understand his writing.

17. At this meeting, the defendants' agents advised of the narrative and also advised that Raphael had possession of a piece of metal in his locker and had displayed another piece of metal in the hallway.

18. Defendant Kolesar told plaintiffs that he had contacted the high school's assigned police officer to ascertain whether Raphael could use the piece of metal from the locker as a weapon.

19. At this meeting, the history teacher reported that Raphael had made a joke in the history class, relating the teacher' tone of voice to a "sponge bob" doll she had on the wall.

20. At this meeting, a teacher's aid related that Raphael had stated that her child vomited at a local drug store because soda bombs were set off. This report caused defendant

Kolesar to alert the police that there might be a bomb near CVS in Warwick.

21. After he called the police, defendant Kolesar spoke with Raphael and learned that Raphael never made any comment about a "bomb" and so related to plaintiffs.

22. At this meeting, defendant Kolesar told plaintiffs that he had shown the piece of metal to defendant Greenhall.

23. At this meeting, defendant Girardi characterized Raphael, who she had never met or spoken with, as "disturbed," and offered plaintiffs a choice: Raphael could either see a psychiatrist for or be suspended for five days for possession of a piece of metal.

24. Plaintiffs asked why Girardi was making such a recommendation and she recounted issues relating back to Raphael's possession of a bottle of champagne and some firecrackers in a backpack in October 2006. She continued to insist that Raphael was disturbed and overrode the plaintiffs' interpretation of their own son's behavior.

25. At the same meeting, Raphael's science teacher reported that Raphael was an outstanding student who presented no problems at all.

26. At this meeting, plaintiff Nan Ping insisted that she would take her son to a psychologist, but did not want to have her son see a psychiatrist because she did not want him to be placed on medications.

27. In the days following this February meeting, plaintiff Nan Ping spoke again with defendant Girardi, who continued to insist that Raphael see a psychiatrist.

28. Despite this insistence, with Kolesar's approval, plaintiffs arranged for Raphael to be evaluated by a psychologist who prepared a report which plaintiffs provided to Kolesar in March 2007.

29. Defendant Kolesar requested no further evaluation or care for Raphael following

his receipt of that report.

30. After the February meeting, plaintiff Cox called defendant Girardi who refused to allow him to speak and explain his son's conduct.

31. Thereafter, school cameras caught Raphael drawing a line in pencil on the wall of the school.

32. Plaintiff Cox spoke with defendant Kolesar and suggested that, as sanction, his son clean the wall.

33. Defendant Kolesar declined this offer and instead Raphael served a one day suspension.

34. In April 2007, Raphael wrote another journal entry entitled "Racing Time." This writing responded to an assignment from his English teacher asking students what they would do if they knew they had only 24 hours left to live.

35. Raphael's teacher came into possession of this writing several weeks before the Virginia Tech massacre and took no action based upon it.

36. After that massacre, his English teacher brought this journal to defendant Kolesar's attention.

37. In his writing, Raphael explained that he would rent the biggest yacht in the world, take his friends to the Caribbean, drink, do drugs, take poison and then shoot himself. This apparently derived from Raphael's recent in-school study of Hitler's death.

38. Defendant Kolesar took the journal entry to defendant Greenhall.

39. Defendant Greenhall took the matter up with the school district's attorney, inquiring whether the mere mention of a gun deserved suspension.

40. Counsel advised that it did not.

41. Defendant Greenhall never himself read the journal.

42. Defendant Kolesar advised that the journal entry was about suicide without advising that the subject matter of the assignment was what you would do during your last 24 hours of life.

43. On the basis of this journal entry, defendant Kolesar requested permission from defendant Greenhall to call the CPS hotline in Albany.

44. Defendant Greenhall approved this call.

45. Defendant Kolesar, or his agent, called the hotline and advised that Raphael was homicidal, suicidal and a danger to himself and/or others.

46. The caller also falsely stated that plaintiffs were providing a minimal degree of care to their son.

47. In making this call, defendant Kolesar intentionally misrepresented Raphael's situation, the level of parental caring and involvement with him and attempted to create an entirely false sense of urgency.

48. Before making this call, defendant Kolesar directly questioned Raphael and repeatedly asked him whether he wanted to kill himself or anyone else.

49. Raphael denied any suicidal or homicidal ideation or intent.

50. Based on his journal writing, on April 19, 2007, defendant Kolesar isolated plaintiff in a separate room all day.

51. On April 20, 2007, Raphael was permitted to attend school, a reversal of Kolesar's earlier statement that Raphael was going to be suspended for five days and would have a superintendent's hearing.

52. On Friday morning, April 20, 2007, plaintiff Cox e-mailed the superintendent and

principal noting that they were again misconstruing Raphael's intent and neglecting that he was responding to a school assignment.

53. At 10:10 am on April 20, 2007, defendant Kolesar called Nan Ping and stated there would be no consequence against Raphael for the journal entry and that Raphael would be able to speak with a guidance counselor if he needed to talk with anyone.

54. During this call, Nan Ping and Kolesar agreed to meet Monday with plaintiff Cox.

55. During this call, Nan Ping denied that Raphael was suicidal or posed a threat to anyone.

56. By the time call occurred, defendant Kolesar had already authorized his staff to make a report to CPS in Albany and the call was made 20 minutes before the call Kolesar initiated with Nan Ping.

57. In this call, Kolesar misrepresented his perception and intent to Nan Ping and failed to advise her of any threat or concern he then felt her son posed.

58. At 2:00 p.m. on April 20, 2007, a CPS worker called Nan Ping and advised her that Raphael needed an immediate psychiatric evaluation. She asked Nan Ping whether she would come in voluntarily or, if not, advised that CPS would take custody of her son.

59. Plaintiff Nan Ping responded that she was shocked since several hours before, she had arranged to meet the following Monday with the principal and he said nothing concerning any emergent situation or threat. Nan Ping asked where this was coming from.

60. At 3:00 p.m., plaintiff Nan Ping received a call from a CPS agent who was at the school and stated that she needed to take Raphael away.

61. In response to this call, plaintiff Nan Ping went to school and advised the CPS worker that she needed to await plaintiff Cox's arrival to decide how the family wanted to

proceed.

62. While awaiting plaintiff Cox, defendant Greenhall started to engage defendant Girardi in conversation.

63. Plaintiff Cox arrived at 5:00 pm and met with the CPS worker.

64. On April 20, 2007, Raphael spent all day being questioned without lunch.

65. The CPS worker advised plaintiff Cox that unnamed school authorities had portrayed Raphael as homicidal, suicidal and a danger to himself and others.

66. School staff had told the CPS worker that Raphael had been bullied, was depressed and a loner and profiled him as if were the Virginia Tech killer.

67. These depictions were substantially false.

68. During the same conversation, the caseworker told plaintiff Cox that if did not "voluntarily" agree to a psychiatric evaluation for Raphael, CPS would take custody of his son and she did not know when plaintiffs would next be able to see him.

69. The CPS worker advised that a mobile mental health evaluation could provide service at Nan Ping's home.

70. The mobile mental health unit concurred, as had been predicted, with the CPS recommendation for a psychiatric evaluation.

71. With that, plaintiffs took their son to the emergency room at Arden Hill Hospital.

72. The plaintiffs remained there until about 2:15 am or for more than 4 hours.

73. The psychiatrist interviewed Raphael and determined he was not in need of hospitalization. She noted there was no emergency and that it was safe for him to leave with his parents. She recommended a follow-up psychiatric evaluation which plaintiffs obtained for their son.

74. The psychiatrist who then saw Raphael twice concluded that he was fine.

75. In July 2007, CPS continued its investigation and found no cause for any findings against plaintiffs and no basis for the ordeal plaintiffs and their son endured.

76. Defendants recklessly concluded that Raphael posed a threat to himself or others on the basis of fictional writings protected by the First Amendment.

77. Defendants Kolesar falsely and, without any basis in fact, filed a report with CPS which maligned plaintiffs and profiled their son as a threat to himself and others.

78. Without basis in fact, defendant Greenhall recklessly approved the filing of the afore mentioned CPS report.

79. Defendant Girardi instigated the report to CPS by recklessly misinterpreting Raphael's writing, refusing to meet with him, stating that meeting with him was not her job and then insisting upon unnecessary interventions which interfered with plaintiffs' right to rear their child in consideration for not imposing or seeking punitive measures against Raphael.

80. Plaintiffs did not return Raphael to the middle school after April 20, 2007; he was tutored at home thereafter until the end of the school year.

81. For the 2007-08 school year, Raphael has attended Storm King School at a considerable expense [some $25,000] to plaintiffs.

82. The decision to have Raphael attend this private school followed plaintiffs' conclusion that their son would not be safe from undue interference in the defendant school district.

83. It is foreseeable that Raphael will not be able to return to the Warwick Valley School District at any time before his high school graduation.

83. Defendants' conduct as set forth above has substantially traumatized Raphael and

substantially, adversely affected his trust in persons in authority and chilled his willingness to engage in creative expression.

84. Defendants' conduct as set forth above has caused plaintiffs' and their minor son substantial anxiety and mental anguish.

IV. **CAUSES OF ACTION**

85. Plaintiffs incorporate paras. 1-84 herein as if fully repeated.

86. By taking adverse actions against plaintiffs and their son on the basis of his protected speech which do not pose a threat to public safety or to himself or others, defendants violated Raphael's right to free speech as protected by the First Amendment and as made actionable against them pursuant to 42 U.S.C. sec. 1983.

87. By falsely reporting that plaintiffs were providing minimal care for and neglecting their son, defendants Greenhall and Kolesar violated the privacy rights of the plaintiffs and interfered with their right to raise their child in violation of the due process clause of the Fourteenth Amendment, as made actionable as against them pursuant to 42 U.S.C. sec. 1983.

88. By recklessly making false accusations in his report to CPS, defendant Kolesar, as approved by defendant Greenhall, violated the substantive due process rights of the plaintiffs as provided by the Fourteenth Amendment and as made actionable by and through 42 U.S.C. sec.1983, as their conduct was arbitrary, capricious and shocking to the conscience

89. By repeatedly searching Raphael's locker without particularized cause and with no reasonable basis, defendants Greenhall and Kolesar violated his right to privacy as protected by the Fourth Amendment to the United States Constitution as made actionable by and through 42 U.S.C. sec. 1983.

## V. **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray that this Honorable Court:

a) accept jurisdiction over this matter;

b) empanel a jury to hear and decide the matter;

c) award compensatory damages to plaintiffs and on behalf of their minor son, including the cost of his private school education through high school, on each cause of action;

d) award plaintiffs the reasonable attorneys fees and costs incurred in this action and

e) enter any other order in the interests of justice and equity.

Respectfully submitted,

MICHAEL H. SUSSMAN

SUSSMAN & WATKINS
PO BOX 1005
GOSHEN, NY 10924
(845)-294-3991

COUNSEL FOR PLAINTIFFS

right to rear their child